May it please the Court, my name is Andre LaRose and I represent C.D. and N.B. who are the parents of C.D., a minor child. And before I start with the main points of the argument, I want to clarify two things. The two issues before this Court are whether there were procedural violations during the 2003-2004 school year which resulted in a denial of a free appropriate public education. The second issue is whether there was a substantive denial of FAPE in the May 2004 IEP which failed to provide extended school year services for this young 3-year-old with autism spectrum disorder. Counsel, can we get to the substantive issue if we decide the procedural issue in your favor? For the school year, 2003-2004 school year, no you do not. If you decide the procedural violations in our favor, then that is all that is required and under precedent in this circuit. You do not proceed to the second prong of the inquiry to evaluate the substantive appropriateness of the IEPs during that school year. That started in 1992 with the Target Range case and has been held consistently throughout the years in this circuit. So let me just be sure I'm clarifying. You're dealing with two different time periods in your two different claims. That is correct. One is the procedural argument about the earlier time period and then the substantive argument about the later time period and the extended school year. That's exactly correct. 2003-2004 is the procedural violations, only the summer of 2004, the extended school year services denial. Let me ask you a question because you've raised this in your opening comments. Let's assume for the sake of this question that we were to conclude that the substance of the IEP for 2003-2004 was proper or sufficient or met whatever the legal standard is, but that there were procedural errors that were made. In that circumstance, what is the available relief? What's the remedy? The available relief would be to order compensatory education services or to order reimbursement for the unilateral placement that the parents provided. They provided additional services at the COTEACH program, which is a university-based integrated preschool program designed specifically for children with autism by the Center for Excellence. Was that during the school year, the September, June? 2003-2004. 2003-2004. Once the district reduced the program by more than half to only five hours a week, the parents had the young child enrolled in the COTEACH preschool program. Actually, I think he was enrolled in that program the whole year. So did not result necessarily in an, I guess that's my question. You're saying that they would get reimbursement and presumably their attorney fees as well for that period of time. Even if we were to conclude that the substance of what was provided was sufficient, if the procedure was insufficient. That's true for two reasons, Your Honor. And one is that it's as this court has held time and again, and as Justice Alarcon has held in ML versus federal way, that it would be improper to jump ahead to the second prong of the inquiry to determine if the procedural violations were harmful. Because you can't speculate about what the lost educational opportunities would be. That would be changing the 20 years of precedent in this court, Your Honor. Or almost 20 years of precedent. Are all procedural violations equal for that purpose when there was here, for example, a delay in assessment? No, Your Honor. I don't think they're all equal, but they all have to have a common foundation, which is that the procedural violation has to negatively impact meaningful parental participation or result in a loss of educational opportunity. And in this case, it clearly resulted in a loss of educational opportunity in that, contrary to all the replicable research on effective teaching and learning practices for children with autism, that preschoolers are in this critical window of opportunity and need to receive at least 20 to 40 hours of services per week. This school reduced it to five hours per week. Part of the reason that I'm asking, the question that I'm asking is that your evidence was that there was a window before age five, I think was the evidence. And now he's probably eight or more than five by my count. And so, you know, in one sense, you can't make up for lost time now. And that's partly why I was asking the question. It's true. You cannot turn the clock back. And that's why it's so critical that there are parents in this case, as in parents in many other cases, stepped up to the plate and provided alternative services for their child. And also, I do want to point out that in Shapiro versus Paradise Valley, a 2003 decision, this court did order reimbursement for the entire school year based on the denial of a fate based on procedural violations. The procedural aspects of the IDEA are critically important and have been increased over the amendments. And so, counsel, I have a series of short questions to help me on the procedural issue. The Sparta school district prepared an IEP. That's correct. And I take it you're not raising any problem about that parent participation and so forth. Correct. Did the Sparta program take into consideration the autism problem this child had? Your Honor, I can't say what they did or did not do. I can only see the IEP that they provided. The reason, okay, my second question then is, in September of 2003, there was an IEP team at Hellgate. That's correct. And they, with the parents and apparently with their approval, decided to continue with the Sparta program. The Hellgate school adopted the Sparta IEP and began to implement it and then held an IEP meeting where they proposed an evaluation plan. And when was that? That was on September 22nd of 2003. Okay. Now, at that meeting, was anything presented to the team about the autism problem? It was not by the school district or by the parent, but the school district had read the evaluation by Dr. Gold, which had documented that there were autistic components to his performance. But the team had not been apprised of that. Is that right? Well, the team testified that they read that report. So that was their testimony. And that was the August 2003 report? It was actually prior to August 2003, but the team read it in August 2003 when the family moved to Missoula. So the report was given to Hellgate and that was presented in September? The report that said that Dr. Gold said there was a problem? The report was presented to the school special education director in August 2003. It was put in the files. The team members testified that they read the report, but it was not by the parent. In fact, there's unrefuted testimony that the special ed director was apprised by the mother that Dr. Gold's opinion was that he could very well have autism, but he hesitated to label him as such at that age. So when did the procedural violations occur? I think the first procedural violation occurred with that so-called diagnostic IEP in September of 2003, because at that point there was a valid IEP in place, the SPARTA IEP, which had been adopted by Hellgate. And under Montana law, the parent has to consent to any change in the IEP, any placement, which was an error of law that was committed by the district court, said the parent's consent didn't matter, and that's just outright an error of law under Montana law. Administrative rules have always required parental consent for any change in placement in the IEP in Montana. So what's the procedural violation when the diagnostic IEP is done? What was the procedural violation? The procedural violation was that knowing informed parental consent was not obtained. So therefore, I think it even is elevated to more than a procedural violation. It's fatal to the IEP. It means there was no valid IEP that replaced the Hellgate-adopted, SPARTA-adopted IEP. The second violation was that it didn't even have the core required elements of an IEP. There were no goals and objectives in the IEP. So it wasn't even an IEP. It was an evaluation plan. It was a plan to observe him in the classroom and to learn more about him so they could develop their own IEP. But didn't the mother sign accepting the plan? How is there a procedural violation if she did sign but she did not sign knowing that it reduced the program in half? She was confused. Both the district court and the hearing officer recognized, as a matter of fact, her confusion but said it was not of legal significance. I contend it is because under Montana law consent is required and also under Ninth Circuit law, if I may, Adams v. Oregon and other cases have held that parental consent to the IEP does not mean that the parent is precluded from challenging that IEP later. It's not a contract. But on a procedural basis, that there was no notice, if she signed it, that's notice. I don't get your argument that she didn't have notice of it if she signed it. She signed an evaluation plan. She didn't know she was signing an IEP that replaced the other IEP. The other IEP called for 13 1⁄2 hours of services. She assumed that when they removed him from the 4-year-old classroom that they would provide some other alternative services in place of that. And this was an evaluation plan to observe him only in the 3-year-old classroom. So there was no knowing informed consent. And additionally, the other procedural violation, besides not having any goals and objectives, not even being an IEP, is that there was no prior written notice. And the statute requires prior written notice. This is a parental right that is very, very often overlooked by school districts. And the prior written notice is interpreted as to be the IEP document itself or the, in this case, evaluation plan itself. And in that document, it did not even explain what the proposed action was. That's the most basic violation of the written notice requirement, is what the district planned to do, that they planned to reduce the services and to follow the IEP goals and objectives from the prior IEP. And that's just not how you do IEPs. You don't piecemeal them together like that. Female Speaker 1 Well, what regulation governs interim IEPs? Dr. Jane Wood There is no provision for interim IEPs in IDEA 1997. And no regulation. Female Speaker 1 No regulation governing diagnostic IEPs. So this was all outside, in your view, all of this was outside the regulations in IDEA? Dr. Jane Wood Totally. Dr. Robert R. Reilly Is it your position, then, that if the school district concludes that an existing IEP is not functioning properly, that they cannot study and come back with an IEP that takes care of the child's problems? Dr. Jane Wood I think they can come back with an IEP. But what's critical to understand is that they have to implement the current IEP, in effect, a current valid IEP, until they make that change with a team decision. This was not a team decision. It was not true, meaningful parental participation. Dr. Robert R. Reilly Do I have the facts correct or incorrect? I thought that the school determined that the child was not functioning well under the SPARTA IEP, and that's why they decided to make this study. Dr. Jane Wood They did, Your Honor, but they don't have the authority to unilaterally change the IEP. That's a team decision, and that's a critical underpinning of the IEP, of the IDEA, and especially in Montana law, which has always required parental consent to changes in the IEP. And also, they say subjectively, he was overwhelmed in the four-year-old class, so we took him out. They did not disclose in prior written notice any other options they considered, likely because they considered no other options. And yet, here we have this model program at the University Center for Excellence that provides preschool, integrated preschool for children with autism. They never considered that. They didn't consider anything other than, here's this three-year-old not doing well in the four-year-old class, so we're just going to cut his services by more than half, despite what the educational, effective educational practices are.  Before you cede your time to the school district, the school district did not arrange for the testing, nor do the testing, but told the parents to have their child tested. Is that  Dr. Jane Wood That's correct, Your Honor. Dr. Jane Wood And is that one of the procedural errors that you're relying on, on appeal? Dr. Jane Wood Yes, it is, Your Honor. And that harkens back to target range in other cases that say you cannot shift the burden to the parent. Dr. Jane Wood And so, if I understand your argument correctly, and I'm somewhat summarizing because we're using your clock, the district knew by August 2003 that the child was potentially autistic or had an autism disorder of some kind, but did not test and never did arrange for the testing, which didn't happen until the following March. Is that a fair summary? Dr. Jane Wood That's a fair summary, although the school district never did arrange for the test. It was the parents who arranged for it. And there is unrefuted testimony that the special ed director said, I don't believe he has autism. If you believe it, go get a test. And so I think the school district definitely shifted its burden. I realize I'm out of time. There are so many the legal test for free appropriate public education and the legal test for extended school year services that we haven't even touched on, Your Honor. Dr. Jane Wood But we recognize that you have not given up any of the arguments in your briefs, and the briefs are quite complete. So we will consider all of those arguments as well. And we will hear from the school district, and we'll give you a little bit of time on rebuttal. Dr. Jane Wood May I just wrap up with two points on those? Dr. Jane Wood Very quickly. Dr. Jane Wood The first is that we are not asking this court to reject the Rowley-Fape standard. We're only asking this court to interpret the term educational benefit. And we need to not only look at the purpose of the act and the findings, but also many, many requirements that increase the quality of the education that's required and increased outcomes. And for extended school year services, I want to point out that there is no legal basis in the statute for limiting that to regression recoupment. It's an artificial restriction. It's the only area of FAPE that has such a superimposed restriction. Thank you. Dr. Jane Wood Thank you, counsel. Ms. Bradmer, can you yeah, you did it already. Thank you very much. We'll hear from Ms. Kaleva. Ms. Kaleva May it please the court, my name is Elizabeth Kaleva and I'm here today representing the Hellgate Elementary School District in Missoula, Montana. The school district will present evidence today showing you that the district court and the hearing officer applied the correct standard when determining that the during the course of the 2003-2004 school year. In particular, when they determined that extended school year services were not necessary for CB. Dr. Jane Wood Counsel, do you disagree or agree with the proposition that if there is a procedural defect, that we don't reach the merits of what the whether the IEP was a good one or a bad one? Ms. Kaleva I would disagree. I think that in determining whether or not there was a procedural defect, you would need to determine if there was any sort of loss of educational opportunity or loss of parental right of participation. And in this case, obviously the Hellgate Elementary School District would argue that there was no procedural violation. Specifically, I would point to just during the last argument, a question was asked whether or not there were, if there was any guidance or administrative rule regarding an interim IEP. And in Montana there is. It's Administrative Rule 10.16.3342. It governs the transfer students of interstate and interstate transfers. Specifically, it states that if the current IEP is not available or if the new school district or the parent believes the IEP is not appropriate, the new school district must develop a new IEP through appropriate procedures within a short time. It goes on to say before the new IEP is finalized, the new school district may provide interim services agreed to by both the parents and the new school district. In this case, that's exactly what happened. CB came to the Hellgate Elementary School District in August of 2003 with an IEP that had been developed in Sparta, New Jersey. It had never been implemented. It had been developed by that team and had been transferred to Montana. The team at Hellgate Elementary School District reviewed the IEP and with the consent of the parent, chose to implement the IEP. Almost immediately, they realized that it was overwhelming for CB, they being the school personnel, those folks who were serving here. So the opposing counsel's position is school personnel would not have the authority, it would have to be the IEP team that would make that determination. What's your response to that? It was brought to the IEP team at the November 22nd IEP team meeting. Evidence was presented at that time that the placement that was proposed by Sparta was overwhelming to CB. Part of the reason it was overwhelming, because the parents had voluntarily placed CB in this Montana practicum teaching program for students. At that program, CB was receiving services that differed from the services that were being provided by Hellgate Elementary School District. Contrary to the allegations of counsel, that was not a unilateral placement that was made by CB's parents. CB was on the waiting list for that program before he enrolled in the Hellgate Elementary School District and began receiving services at that program within four days of his attendance at Hellgate Elementary. The district did not, that was not a unilateral placement due to lack of services. He was actually receiving two different programs during that small three-week period when the school district determined that he was overwhelmed and called for the IEP team meeting, which happened within three weeks of CB starting. My concern is one that I raised with opposing counsel, and I'd like your response to it. As I understand the statute, the school district has the responsibility to evaluate CB's children who have a suspected disability, and there also is some level of requirement to seek out the child find obligation is there as well. In view of the school district's knowledge of the report from Dr. Gould in August of 2003, the school district's knowledge of the report from Dr. Gould in August of 2003, why isn't there a procedural violation in not having tested and evaluated him by the specialists that eventually he was seen by in March? Your Honor, the report that was submitted to the IEP team came from Dr. Gould. It was the same report that was reviewed by the Sparta School District. Neither the Sparta School District nor the Hellgate Elementary School District personnel viewed Dr. Gould's report as a statement that this student suffered from autism. In fact, he blamed autoconfusion and static encephalopathy for the difficulties that this student was facing. The personnel from Hellgate Elementary School District unanimously testified they did not believe that the student had autism. Okay, but by November, the mother had told them that she suspected autism, correct? Correct. And still the school district did no testing. What the school district did, and this is common in Montana, most school districts in Montana do not have teams that are qualified to test a student for autism. The expert that testified on behalf of the parents in this case, Dr. Cook, testified that it was appropriate for the school district to refer the parents to the Child Development Center. The question really in my mind isn't who does the testing, and it doesn't seem to me reasonable to expect that every school district in the country can do its own work in this regard. But as I read the statute, it is the school district's duty to make the arrangement and make sure that it happens in a timely fashion, and not to just send the parents off with a prescription pad recommendation. Well, the testimony at the hearing, Your Honor, was that the school district had referred the parents to the CDC in September, and the parents had chosen not to take that recommendation. But that doesn't answer my question. Why isn't it the school district's job to make the phone call to arrange for the testing? I mean, you almost have come against your earlier argument. If they're recommending this testing in September, then there's some belief that they suspect that something may be amiss. Your Honor, they did not recommend autistic testing in September. They recommended the family to CDC for general support services. Okay. Well, by November, the question still remains. Why wasn't it the school district's duty to make those phone calls, set up those tests, and so forth? They didn't believe they had the authority to force the parents to have the test. What they believed was, and what was the appropriate practice in Montana, was to refer the parents to CDC. Well, but there are a lot of other options. One is to say, gee, you know, now that you've told us that your child might be autistic, the law suggests that we ought to be determining whether that's true and making an approach. So would you like us to call for you? You know, there are lots of ways to do it besides just saying, here's some places you can go. Well, and Your Honor, I would agree with you. There are lots of ways they could do it. But the way they did it was perfectly acceptable. Well, that's the question we're here to answer. In this case, the mother was very active in these discussions and took the suggestions of the school district to contact the CDC. The school district was not aware that she had not followed up, and CDC had threatened to close the file. But the question we have to decide is, was that enough? Or did the school district have a responsibility to make sure that the child was tested as soon as they were aware that that might be a problem? And I understand the question you're asking, Your Honor. And I believe the school district did do what they were required to do. And if you look at the timing of when the test was first requested and when it was actually performed, it was within two and a half months, which other courts have determined is an appropriate time to gain an evaluation. Well, I'm sorry. Go ahead. What if you have a non-active parent? If you have a parent that's not as conscientious? Then does the school district still relieve itself of its responsibility by merely giving a referral to the parent? Hypothetically, Your Honor, no. I think that the school district is going to judge the circumstances with each parent and determine what steps they need to take to ensure that an evaluation occurs. The school district personnel all testified they fully believed that the mother was following through with the evaluation and had arranged that herself. But what case authority, what case law supports your argument that the responsibility of the school district varies depending on how conscientious the parent is? I can't cite you to a particular case that's going to have that exact holding, Your Honor. But I think if you look at IDA in general, it talks about the school's obligation to secure evaluations. Because the obligation is to the child, right? Absolutely. Did the Hellgate meet that responsibility? You decided the statute said it's their responsibility to secure the testing. I believe they did in the fact that the testing did occur. Had Hellgate determined that testing was not taking place, they could have gone forward either with a due process hearing to force the issue with the parents. They had no reason to believe that the evaluation testing wasn't ongoing from November. It's a long, long time. For us as adults sitting here to say, well, they knew about it in November and it happened in March and that's pretty quick. That's half a school year. That's a long time in the life of a little kid. I agree with you. But I also would submit that testing for autism is not something that can happen overnight. And other courts have determined If the arrangement or the call had been made in August when the SPARTA IEP first Wouldn't it have happened a lot sooner than March? If it were reasonable to believe the school district personnel believe that that student was autistic at that time, it would have happened sooner than March. I agree with you. Did they have to believe that he was autistic or did they have to believe that there was a potential that he might be that required additional testing? They would have had to agree that there was the potential that he was autistic. The staff testified unanimously that they did not believe that was the case. In fact, a testimony at the hearing indicated that CB's mother specifically told the staff at CoTeach that she thought there was an issue with autism. She also testified at the hearing that she did not share that information with the school district. And the school district staff was clear and unanimous that they did not believe that autism was an issue in August. They did presumably read Dr. Gohl's report, so some of this will depend on what a reasonable person would have taken from that report. Very true. And the school district's expert, Dr. Moss, testified that her reading of the report would not have indicated to her that autism was a possibility at that time, based on the report and based on the SPARTA IEP. Do you agree with opposing counsel that there are two separate claims, one for the 2003-2004 school year and one for the summer of 2004? I do. Okay, so does that bring us to the merits of the ESY claim? Yes, it does, Your Honor. Can I have that brief? I will. In Montana, extended school year services are determined based on the guidance that's provided by the Office of Public Instruction. Specifically, that guidance calls for the district to look and determine whether or not there is a likelihood that the student might regress, and if so, would that student be able to recoup those services within a reasonable time? The Montana guidance also asks the districts and says that the team may consider certain factors. In this case, the team first looked at whether or not the student had regressed and there was any evidence of regression. The special ed director specifically commented during the May 7th IEP meeting that proof of regression was not necessary. It was never required of the parents in this case. The testimony that was given at the time by the individuals who were seen, any demonstration of regression whatsoever. And in fact, the ESY services that were provided by the SPARTA school district from the previous school year did not contain any special services, no speech and language. So they did determine where the student was at the end of the 2003 school year in SPARTA, where he had only been a student for three months, and when he came in August to the Helgate Elementary School District. They also then went on to consider other factors, the same factors that opposing counsels asking this Court to determine as a multi-faceted approach should have been considered were actually considered during that May 7th IEP meeting. In fact, the testimony demonstrated specifically from Lynn Fisher, who was the special education teacher, that they considered the nature and the severity of the student's disability. They considered the ability of the parents to provide a structured educational environment in the home. They considered behavioral and physical impairments of the student. Jamie Frost testified they considered all the data the school had during that school year with regard to regression and recruitment and the progress the student was making, and determined that at that time he was making adequate progress. There were no specific breakthroughs that were happening that would have triggered another factor to consider, but that he was making considerable progress under these IEPs. And Linda Moss, the expert for the school district, also testified that given her reading of all the data and listening to the testimony and talking to the individuals who were involved with this student, that she did not believe that extended school year services were necessary. On the flip side, the experts for the family testified in contrary ways. Dr. Kelker testified that ESY is not necessary for all students with autism, but that she believed that FAPE was denied. She also testified at that time, though, that she was not able to interpret the progress reports for the student, she had not done a complete review of the records, and she had never met the student. Eileen Schwartz testified that in her belief, ESY is absolutely necessary for every single student with autism, regardless of the severity of the disability. Given the evidence that was available to the IEP team, it was reasonable for them to determine that extended school year services were not necessary for this student. And they did use a multifaceted approach based on Montana law, looking at regression and recruitment, that allows you to consider other factors. The team did choose to determine those factors. The testimony at the hearing indicated that the family of CB focused their arguments on the fact that with CB, he was making progress, and they didn't want that progress to stop. They believed it was important to have a continuation of services so that progress wouldn't stop. In fact, one of their representatives described it as, he's on a train, he's moving, we don't want to stop, we don't know what will happen. And that's not an appropriate factor to consider under ESY. The team did determine, using the factors available in Montana, that ESY wasn't appropriate, and also determined that CB would be able to, if there was any regression, he would be able to recoup that in a reasonable period of time. I see that I'm out of time. Is there anything further? When you started, you indicated that the test was that there should be a meaningful educational benefit. Yes, Your Honor, that's the standard the hearing officer used. Did the district court violate that? I don't believe the district court did. While I can see the district court used some language in dicta that could possibly infer that the district did not have to provide a meaningful educational benefit, in his order, the district court judge specifically stated he was affirming the hearing officer's determination that a meaningful educational benefit was provided to that student. And the hearing officer, through a very careful and thorough opinion, went through all the testimony, looked at all the educational data provided, and determined specifically that every IEP, including the interim IEP that was adopted in September, provided a meaningful educational benefit. She also determined that the parents specifically consented to these IEPs, and were aware of what was being proposed by the school district. So the prior notice argument by the petitioners in this case doesn't accurately reflect what actually occurred during those IEP meetings. For example, during the September, the interim or diagnostic IEP, and testimony at the hearing indicated that both those terms are used interchangeably in Montana, that it was specifically discussed that the district was proposing a reduction in hours of services during that interim time due to their concern that CB was overwhelmed by the services that were being provided. The parents specifically consented to that, and did not express any dissatisfaction or dissent with that. In the November IEP meeting, CB's mother expressed concern about him being the only boy in the class, and about the number of hours, but agreed and signed the IEP that those hours that were provided to him were appropriate. In the March IEP meeting, which was attended not only by the parents, by their advocates, but by the folks at the CDC who performed the ADOS evaluation, CB's mother expressed concern that team agreed to an increase of hours, they agreed that goals and objectives were appropriate, and they agreed to do further testing for CB. It was not until after the district determined that ESY was not appropriate that any challenges were made to the previous IEPs or to their content. Thank you, counsel. We used up your time with questions, but you may have two minutes for rebuttal. First of all, I want to correct an inaccuracy when opposing counsel stated that the mother did not share with the district what Dr. Gold's conclusion that CB had possibly had autism. She did specifically testify that she told that to the special education director in August 2003. Noticeably absent from testifying at this hearing was the   conclusion that CB had possibly had autism. So the evidence on that is unrefuted. Also, she said the Hellgate properly replaced the SPARTA IEP with an IEP in November. It was actually the September IEP that reduced the services, and that's the one where there were no goals and objectives, no knowing informed consent, and no prior written notice that meets the statutory requirements. So in a sense, it's fruit of the poisonous tree, because in  fact, if she had not consented to that IEP, then there is an automatic stay put throughout that school year. She spent the rest of the school year begging for more services and would accept what little bit she could get at each of those IEPs after that. As far as extended school year service, I think it's very, very important to note that even though there are several circuit decisions that limit the entitlement to that, to regression and recoupment, there is no analysis in those decisions that ties that restriction to any language in the IDEA. The IDEA is all about progress. It's all about free appropriate public education based on individualized needs. This is the only artificial restriction that takes that out of the hands of the IEP team. And in fact, counsel said there was no proof that they didn't require proof of regression, but then they relied on proof of regression. And you can't prove lack of regression there because he had the services. And then they relied on the fact that during the Christmas break he didn't regress. And that's too short of a break to rely upon. And then with the, I see my time is up, so if there are any questions, I do encourage the court to please look at something I neglected to include in my brief, which is 34 CFR 300.26, which defines specialized education and all of the IEP requirements in 20 U.S.C. 1414 1DA. If that is an item that has not been cited in your brief, would you at the end of the argument speak with Ms. Brebner, the deputy clerk, and provide that citation for the members of the panel and also for opposing counsel? Yes, Your Honor. Thank you very much. Thank you. The case just argued is submitted, and I appreciate the arguments of both counsel. They were very helpful.
judges: Alarcon, Graber, Rawlinson